UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| ARLESIA DAWSON, | ) | CASE NO. 4:17-cv-02652 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| NORTHEAST OHIO COMMUNITY | ) | |
| ALTERNATIVE PROGRAM, et al., | ) | |
| | ) | |
| Defendants. | ) | MEMORANDUM OPINION & ORDER |
| | ) | |
| | ) | |

## I.      Introduction

Plaintiff Arlesia Dawson ("Dawson") was terminated by Defendant Northeast Ohio

Community Alternative Program ("NEOCAP") from her position as Executive Secretary to

NEOCAP's Executive Director, Jake E. Jones, Sr. ("Jones").  She brings federal law claims for

gender discrimination and sexual harassment against Defendants NEOCAP and Jones.  First,

Second, and Fourth Claims for Relief, Doc. 1, pp. 4-6.[1]  She also asserts state law claims for

spoliation of evidence and negligent infliction of emotional distress.  Doc. 1.

Defendants have filed a motion for summary judgment as to all of Dawson's claims.

Doc. 21.  Dawson has filed a cross-motion for partial summary judgment based on her

---

[1] Dawson's First Claim for Relief alleges gender discrimination under 42 U.S.C. § 1983 (equal protection).  Her Second Claim for Relief alleges that NEOCAP is liable under the doctrine of respondeat superior for Jones's actions.  Her Fourth Claim alleges sexual harassment.

contention that NEOCAP is liable on her federal claims because it failed to adopt a policy governing senior-subordinate non-work related social interactions. Doc. 24.[2]

For the reasons set forth more fully below, Defendants are entitled to summary judgment on Dawson's federal claims and Dawson's cross-motion is without merit. Dawson admitted on deposition that she does not believe Defendants discriminated against her and that Jones never suggested that she have anything other than a professional relationship with him. Those admissions undermine her claims and she has not demonstrated the existence of any genuine issue of material fact such that a reasonable jury could find for her on her federal claims.

The Court declines to exercise supplemental jurisdiction over Dawson's state law claims for spoliation of evidence and negligent infliction of emotional distress.

Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 21) as to Plaintiff's federal claims stated in her First, Second, and Fourth Claims for Relief; **DISMISSES WITHOUT PREJUDICE** Dawson's state law claims – the Third (spoliation of evidence) and Fifth (negligent infliction of emotional distress "NIED") Claims for Relief; and **DENIES** Plaintiff's Motion for Summary Judgment (Doc. 24).

## II.     Background Facts

NEOCAP provides an alternative to incarceration for felony offenders. Doc. 1, ¶6. It is the last step in the continuum of increasing punishment before incarceration. *Id*. It is a minimum-security operation housing approximately 120 offenders. *Id*. NEOCAP is

---

[2] While Dawson's Motion characterizes this contention as a claim, it is not pled or even mentioned in her Complaint. Instead, it appears to be a theory that Dawson advances to support liability by NEOCAP for gender discrimination and/or sexual harassment as pled in her First and Fourth Claims for Relief.

administered by a local Judicial Corrections Board that includes at least one common pleas court judge from each county NEOCAP serves.[3]  *Id.*

## A.  NEOCAP employee discipline and harassment policies

NEOCAP has specific procedures and policies to address allegations of sexual harassment and employee discipline that aare documented in the employee Personnel Policies Handbook.  Doc. 21-2.[4]  The disciplinary section of the Personnel Policies Handbook states that NEOCAP employs a "Progressive Discipline" practice to address disciplinary matters.  *Id.* at pp. 2.  This practice includes giving the employee a verbal reprimand and, if a verbal reprimand does not work, giving the employee a written reprimand.  *Id.*  If a written reprimand is not enough, suspension or termination can occur, but the staff member must be given the opportunity to tell his/her side of the issue and there must be an opportunity to correct the situation.  *Id.*  The Executive Director has the final decision regarding the disciplinary action.  *Id.*  Finally, upon receiving the handbook, every employee signs an acknowledgement that states "I understand that the handbook is a set of guidelines and it is not a binding contract and acknowledge that my employment is at-will and NEOCAP can terminate my employment at any time and bypass any disciplinary process if deemed necessary.  *Id.* at pp. 93; Doc. 21-4, pp. 2, ¶10.[5]

NEOCAP's harassment policy states:

> It is the policy of NEOCAP to provide all staff members with a workplace free of harassment as required by Title VII of the Ohio Civil Rights Act of 1964 (as amended), Section 4112.0 of the Ohio Revised Code, and the Governor's Executive Order 87-30.  Every effort will be made to eradicate all forms of harassment.

---

[3] NEOCAP serves the following Ohio counties:  Ashtabula County, Portage County, Geauga County, Trumbull County, and Lake County.  Doc. 1, ¶6.

[4] Doc. 21-2 is an excerpt of NEOCAP's Personnel Policies Handbook that includes the harassment and discipline policies.  This was authenticated by Dawson during her deposition.  Doc. 23, pp. 70:13-71:9.  The Personnel Policies Handbook is also filed as Doc. 24-2.

[5] Doc. 21-4 is Robert Blower's affidavit.  Robert Blower is the Business Director at NEOCAP.

> ALL STAFF MEMBERS ARE RESPONSIBLE FOR ADHERING
> TO THIS POLICY; DISCOURAGING HARASSMENT;
> REPORTING SUCH INCIDENTS TO THE APPROPRIATE
> PERSON; AND COOPERATING IN ANY INVESTIGATIONS
> WHICH MIGHT RESULT.

Doc. 21-2 at p. 4 (capitalization in original).

The Harassment Complaint Procedure states further: "Staff members who believe they have been subjected to harassment will notify any member of management immediately." *Id*. at p. 5.

## B. Dawson's employment at NEOCAP and termination

In her complaint, Dawson alleges that she was personally recruited and hired by Jones. Doc. 1, ¶9. She applied to work at NEOCAP on November 2, 2015. Doc. 23, pp. 45:14-46:5.[6] She applied for the positions of Program Assistant and Resident Supervisor. Doc. 23, pp. 45:24-46:5. However, she was hired as an Executive Secretary to the Director on February 8, 2016. Doc. 1, ¶5. Dawson alleges that, when she was hired, Jones told her that her position as Executive Secretary was to only work for him and that she did not have to take instruction from other personnel unless Jones directed her otherwise. Doc. 23, pp. 54:8-56:1, 58:24-59:19. She continued to work as Jones's Executive Secretary until she was terminated on March 28, 2017. Doc. 1, ¶5.

### 1. Dawson's conflicts with Jones and other employees

During Dawson's employment at NEOCAP, several incidents occurred in which she was in conflict with another employee. First, Dawson and Robert Blower ("Blower") had a verbal

---

[6] Doc. 23 is the transcript of Dawson's deposition taken on July 5, 2018. The transcript page numbers do not match the ECF Doc. page numbers. The citations to Dawson's deposition in this opinion are made to the ECF Doc. page numbers, with line number references as necessary.

conflict in July 2016. Doc. 23, pp. 64:3-10; Doc. 21-4, ¶2. Jones asked Dawson to start helping Blower with payroll. Doc. 23, p. 64:17-21. The verbal confrontation stemmed from a disagreement between Dawson and Blower as to how overtime should be calculated. *Id*. Dawson alleged that Blower wanted to fire her for her insubordination but, when Jones spoke to her about the incident, she alleges that Jones said, "You can't be insubordinate to someone who you're not subordinate to." *Id*. at pp. 66:24-67:5. Jones also told Dawson that sometimes when she raises her voice it could be taken as aggressive. *Id*. at p. 68:6-13. This was documented in Dawson's September 2016 performance evaluation. Doc. 21-3, p. 45.

The second incident occurred in March 2017 when Blower asked Dawson to distribute employees' health insurance cards to their individual mailboxes. Doc. 23, pp. 79:8-23, 80:25-82:7. To distribute the cards, Dawson put a note on the time clock for the employees to see her to get their cards. *Id*. at pp. 80:16-24. She left the note for employees because there had been previous problems where items in mailboxes had disappeared and she did not want the health cards to be taken. *Id*. Blower talked to Jones about Dawson's failure to follow directions. *Id*. at pp. 82:8-85:13. When Jones spoke with Dawson regarding the insurance cards and informed her to put the insurance cards into the mailboxes, Dawson responded by stating, "do not say anything to me if they -- if [the insurance cards] disappear out of the mailboxes." Doc. 23, pp. 84:4-85:23. Dawson acknowledged that Jones had indicated Dawson raised her voice with him when indicating that he should not blame her if the insurance cards disappeared but did not recall raising her own voice regarding that issue. Doc. 23, p. 8:14-23.

The final incident occurred roughly a week later on March 22, 2017. Doc. 21-3, p. 48. Dawson was wearing headphones while working at her desk. *Id.* Jones asked her to remove the headphones. *Id.* Jones claims that Dawson was argumentative after he asked her to remove her

headphones. *Id.* Dawson alleges that she had worn her headphones while working many times before and no one had said anything to her about it until that day. Doc. 23, p. 129:12-23. After the headphone incident, Jones met with Dawson in his office to discuss her behavior. Doc. 21-3, p. 48. Jones indicated in a personnel file memo that Dawson continued to be argumentative during the meeting.[7] *Id.* Within the same personnel file memo, Jones indicated that he told Dawson that he "would not accept her argumentative insubordinate behavior toward [him] or . . . Robert Blower, as she did one week [prior] when he asked her to put staff medical cards in their mailboxes [and] . .. [that] type of behavior reaches the[] level of terminable." Doc. 21-3, pp. 48. Dawson did not recall Jones telling her the foregoing during the March 22, 2017, meeting. Doc. 23, pp. 136:24-137:9.

### 2. Non-work related events and Jones's visits to Dawson's house

#### a. Non-work related events

During her deposition, Dawson explained that around June of 2016, Jones required that she assist with and attend non-work related events. Doc. 23, pp. 115:19-116:10; 121:19-22; 124:11-125:5. The non-work related events were related to a cause that Jones was involved with, i.e., the Howland Terrace or Howland Home Reunion, and involved selling t-shirts for that cause and attending the reunion. Doc. 23, pp. 115:19-116:10; 124:11-125:5.

#### b. Jones's visits to Dawson's house

During July 2016, Jones appeared at Dawson's house on three separate occasions. Doc. 30-2, pp. 5-7. On the first occasion, Jones was driving by and saw Dawson working outside so he stopped to talk to her. *Id.* The second and third visits related to Dawson's request to Jones to

---

[7] This incident was documented in Dawson's personnel file on March 22, 2017, in the same memo as the insurance card incident. Doc. 21-3, p. 48.

borrow NEOCAP's cornhole boards for a party she was throwing. *Id*. Jones dropped the boards off and later picked them up. *Id*. On all three occasions, Dawson invited Jones inside and offered him a drink, to which Jones said yes. *Id*. During one of these visits, Jones explained to Dawson how he gets women who do not want to sleep with him to change their minds. *Id*. Dawson alleges that the sexually based conduct to which she was subjected was Jones coming over to her house uninvited because he was a married man and her superior and she was an unmarried woman. Doc. 23, pp. 93:12-94:5.

### 3. Dawson's termination

On March 27, 2017, Jones gave Dawson a written reprimand. Doc. 23, pp. 137:22-138:9, 138:23-139:5. The written reprimand stated that it was a follow-up to a recent meeting they had regarding Dawson's continuous argumentative insubordinate behavior. Doc. 21-3, pp. 49. The reprimand also said that Jones spoke with Dawson "many times regarding [her] unacceptable behavior" over the course of her one year of employment. *Id*. Dawson disagreed that Jones spoke with her many times. Doc. 23, pp. 139:12-22. Additionally, within the reprimand, Jones ordered Dawson to come in the following day, March 28, 2017, with a plan to improve her performance deficiencies. Doc. 21-3, pp. 49. It also advised her that any "future acts of this nature will result in disciplinary actions that may include suspension or termination." *Id*.

The following day, Dawson had an improvement plan typed on her computer. Doc. 23, pp. 146:2-24. When she arrived in the office, she did not have time to print the plan off before she was asked to meet with Jones, but she had some hand-written notes that she grabbed to take into the meeting with her. *Id*. at pp. 148:3-149:9. Kim Massary, Director of Operations at NEOCAP, was also at the meeting. *Id*. at pp. 149:15-17. Dawson claims that, when she entered the conference room for the meeting, she relayed that she had something she wanted to say and

Jones responded that it would be a waste of her breath and their time but to go ahead and say it. Doc. 23, p. 149:20-24. At that point, Dawson felt she was going to be fired so she opted not to go over the plan she had on her paper and spoke directly to Ms. Massary, explaining that she had followed the onboarding procedure[8] and that she did not understand why she was being fired.[9] *Id*. at pp. 149:24-150:9. In his write-up of the incident, Jones alleges that Dawson failed to present any plan to correct her behavior but instead said how she was not the problem and that Jones was the problem. *Id*. at pp. 145:13-23, 151:17-24; Doc. 23-1, p. 47. Dawson was terminated after this meeting. Doc. 21-4, p. 1, ¶ 6; Doc. 23, pp. 155:12-19; Doc. 23-1, p. 47.

### 4. Decision by Unemployment Compensation Review Commission

Dawson filed for unemployment compensation on March 29, 2017. Doc. 30-4, p. 52. Dawson's application for unemployment compensation was initially denied based on a finding that she was terminated for just cause. Doc. 24-2, pp. 1. Dawson then filed an appeal on May 25, 2017. *Id*. The appeal was granted by the Unemployment Compensation Review Commission (UCRC). *Id*. at p. 2. The UCRC reasoned that, while Dawson was in the meeting with Jones, "[her] attempt to explain her position may have been argumentative and warranted some type of discipline, it [did] not constitute insubordination sufficient to warrant her immediate discharge." *Id*. Therefore, the UCRC determined that Dawson was discharged without just cause so she was entitled to unemployment compensation benefits. *Id*.

## III.    Law and Analysis

### A. Summary Judgment Standard of Review

---

[8] Dawson stated in her deposition testimony that the onboarding procedure occurred during an employee's probationary period and involved writing questions for the directors so an employee felt they could talk to directors. Doc. 23, pp. 150:10-20.

[9] In her deposition, Dawson stated Jones did not tell her she was being fired. However, after Jones told her "this isn't working out, we're not compatible[,]" she asked Jones if he was firing her and he responded, "yes, you're fired, clean out your desk." Doc. 23, pp. 151:3-9.

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The movant "bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*¸ 477 U.S. 317, 323 (1986) (internal quotations omitted).

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). "Inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Id.* at 587 (internal quotations and citations omitted). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The non-moving party must present specific facts that demonstrate there is a genuine issue of material fact for trial. *Matsushita,* 475 U.S. at 587. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1986).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "A genuine issue for trial exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Muncie Power Products, Inc. v. United Technologies Automotive, Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (quoting *Anderson*,

477 U.S. at 248). Thus, for a party to avoid summary judgment against him, "there must be evidence on which a jury could reasonably find for the plaintiff." *Id*. at 252. Accordingly, in determining whether summary judgment is warranted, a judge generally asks "whether there is evidence upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Id.* (emphasis in original) (internal citations omitted).

The legal standard applied to cross-motions for summary judgment does not differ from the standard applied when one party to the litigation files a summary judgment motion. *Ferro Corp. v. Cookson Group, PLC*, 585 F.3d 946, 949 (6th Cir. 2009). Each cross-motion must be evaluated on its own merits, with the court viewing all facts and reasonable inferences in the light most favorable to the nonmoving party. *See Appoloni v. U.S.*, 450 F.3d 185, 189 (6th Cir. 2006).

**B. Defendant's Motion**

In their Motion for Summary Judgment, Defendants contend that they are entitled to summary judgment on all five claims because there are no genuine issues of material fact based on Plaintiff's own testimony and the lack of evidence presented by Plaintiff. In response, Dawson argues that, with all reasonable inferences drawn in the light most favorable to her, she has shown through the pleadings, depositions, answers to interrogatories, admissions on file, declarations, and affidavits that there are genuine disputes of material facts as to all claims

**1. First and Second Claims for Relief – Gender Discrimination**

Defendants have moved for summary judgment alleging that Dawson has not cited specific facts from which a jury could find in her favor on all elements of a *prima facie* case of discrimination under Title VII and § 1983 and she cannot demonstrate a genuine issue of material fact.

Four elements are required to establish a *prima facie* case of employment discrimination under Title VII: "(1) [Plaintiff] is a member of a protected class; (2) [plaintiff] suffered an adverse employment action; (3) [plaintiff] was qualified for the position in question; and (4) [plaintiff] was treated differently from similarly situated individuals outside of his protected class." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 570 (6th Cir. 2004) (citing *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000)).

Further, "the showing a plaintiff must make to recover on a disparate treatment claim under Title VII mirrors that which must be made to recover on an equal protection claim under section § 1983." *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988) (citing *Kitchen v. Chippewa Valley Schs.*, 825 F.2d 1004, 1011 (6th Cir. 1987)); *Daniels v. Bd. of Educ.*, 805 F.2d 203, 207 (6th Cir. 1986); *Grano v. Dep't of Dev.*, 637 F.2d 1073, 1081–82 (6th Cir. 1980); *Lautermilch v. Findlay City Schs.*, 314 F.3d 271, 275 (6th Cir. 2003) ("To prove a violation of the equal protection clause under § 1983, [a plaintiff] must prove the same elements as are required to establish a disparate treatment claim under Title VII.").

The parties do not dispute that Dawson is part of a protected class, that Dawson was subject to an adverse employment action (termination), or that she was qualified for the position of Executive Secretary. The Defendants argue that Dawson cannot demonstrate a genuine issue of material fact as to the fourth element—whether Dawson was treated differently from similarly situated individuals outside of her protected class. Doc. 21-1, p. 7. In her Opposition to Summary Judgment, Dawson does not clearly respond to Defendants' arguments regarding the alleged gender discrimination claim. Rather, it is in her Motion for Summary Judgment that Dawson appears to seek summary judgment in her favor on this claim by arguing that NEOCAP does not have an anti-fraternization policy in place.

To make out a claim of gender-based employment discrimination, "a plaintiff must prove that he suffered purposeful or intentional discrimination on the basis of gender." *Smith*, 378 F.3d at 576-77 (citing *Davis v. Passman*, 442 U.S. 228, 234-35, (1979)).  Here, Defendants contend that Dawson was not terminated based on her gender.  In support, Defendants point to Dawson's deposition testimony.  Dawson testified:

> Q.  Do you believe that Mr. Jones or NEOCAP discriminated against you
> because you're a woman?
> A.  No.

Doc. 23, pp. 126:1-3.  Based on her own testimony, Dawson admits that she does not believe she suffered intentional discrimination based on her gender and she points to no evidence regarding differential treatment.

For the reasons set forth herein, summary judgment in favor of Defendants on Dawson's gender discrimination claim against Jones is granted because Plaintiff has not presented specific facts to establish a *prima facie* case of gender discrimination and she has not demonstrated a genuine issue of material fact.  Dawson also seeks to hold NEOCAP liable for gender discrimination against her on the basis of respondeat superior.  "A master is subject to liability for the torts of his servants committed while acting in the scope of their employment." *Burlington Indus., Inc., v. Ellerth*, 524 U.S. 742, 755-56 (1998) (quoting the Restatement (Second) of Agency § 219(1) (1957)).  "An employer may be liable for both negligent and intentional torts committed by an employee within the scope of his or her employment." *Id*. at 756.  As discussed, Dawson failed to show sufficient evidence from which a jury could reasonably conclude that Jones is liable on her gender discrimination claim.  Since there is no liability as to Jones, Dawson is unable to succeed on a claim for respondeat superior liability as to NEOCAP.

## 2. Fourth Claim for Relief – Sexual Harassment

Defendants seek summary judgment in their favor on the issue of sexual harassment.[10]

Courts have traditionally recognized two types of sexual harassment: 1) quid pro quo sexual

harassment, and 2) hostile work environment. *Jaques v. Herbert*, 447 F. Supp. 2d 858, 866

(N.D. Ohio, 2006).

### a. Quid pro quo sexual harassment

To establish quid pro quo sexual harassment, an employee must show:

> 1) that the employee was a member of a protected class; 2) that the employee was
> subjected to unwelcomed sexual harassment in the form of sexual advances or
> requests for sexual favors; 3) that the harassment complained of was based on sex;
> 4) that the employee's submission to the unwelcomed advances was an express or
> implied condition for receiving job benefits or that the employee's refusal to submit
> to the supervisor's sexual demands resulted in a tangible job detriment; and 5) the
> existence of respondeat superior liability.

*Jaques*, 447 F. Supp. 2d at 866-67 (citing *Kauffman v. Allied Signal, Inc., Autolite Division*, 970

F.2d 178, 186 (6th Cir. 1992)).

### b. Hostile work environment sexual harassment

To establish hostile work environment harassment, Dawson must show: "(1) she is a

member of a protected class, (2) she was subjected to unwelcome sexual harassment, (3) the

harassment was based on her sex, (4) the harassment created a hostile work environment, and

that (5) the employer is vicariously liable." *Jaques*, 447 F. Supp. 2d at 869 (citing *Clark v.*

*United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005)).

"It is only 'when the workplace is permeated with "discriminatory intimidation, ridicule,

and insult," that is "sufficiently severe or pervasive to alter the conditions of the victim's

---

[10] While it is not clear which type of sexual harassment claim Dawson alleges (quid pro quo or hostile work environment), for the reasons discussed herein, both types of claims fail because Dawson has not presented evidence on which a jury could find in her favor on all *prima facie* elements for each claim.

employment and create an abusive working environment," [that] Title VII is violated.'" *Jaques*, 447 F. Supp. 2d at 869 (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)). "In making this determination, the Court looks to the totality of the circumstances and considers such factors as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Jaques*, 447 F. Supp. 2d at 869-70. "[H]arassment should be ongoing, rather than a set of isolated or sporadic incidents." *Id.* at 870 (quoting 400 F.3d at 351). "The plaintiff must show that the working environment was both objectively and subjectively hostile." *Id.*

### c. Summary judgment in favor of Defendants is warranted on Plaintiff's sexual harassment claim

The parties focus their arguments on the second element—that the employee was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors.

"Title VII and the Ohio Revised Code do not prohibit all sexual advances in the workplace. Only those advances that are 'unwelcome,' and that meet Title VII's other criteria, are actionable." *Jaques*, 447 F. Supp. 2d at 867. "The correct inquiry is whether [the plaintiff] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary." *Id.* (*citing Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986)). "The conduct at issue must be 'unwelcome' in that the plaintiff neither solicited it nor invited it and regarded the conduct as undesirable or offensive." *Jacques*, 447 F. Supp. 2d at 867 (*citing Bell v. Berryman*, 2004 Ohio 4708, ¶57 (Ohio Ct. App. 2004)). "[A] party cannot create a factual issue by filing an affidavit which contradicts earlier testimony [and] [i]t is not sufficient for [a plaintiff] to simply state after the fact that [the] advances were

unwelcome." *Jacques*, 447 F. Supp. 2d at 867-68 (*citing Lanier v. Bryant*, 332 F.3d 999, 1004 (6th Cir. 2003) (internal quotations omitted)). Additionally, to defeat Defendants' motion for summary judgment, Dawson "must identify evidence in the record from which a jury could find in her favor on each element of the quid pro quo claim." *Jaques*, 447 F. Supp. 2d at 867.

The evidence Dawson cites in support of her claim that she was subjected to unwelcome sexual advances by Jones would not support a reasonable jury finding in her favor on the second element. Dawson claims that this element is purely subjective and that "what matters is how did the victim feel about the behavior?" Doc. 30, pp. 5. However, Dawson does not provide any law to support her argument.

In opposing summary judgment, Dawson cites to her own interrogatory responses and affidavit, in which she claims there were three separate occasions when the alleged unwanted sexual conduct occurred that ultimately led to her termination. Each incident took place when Jones allegedly showed up uninvited to her house on or around July 6, 2016, July 19, 2016, and July 28, 2016. Doc. 30-2, pp. 5-7. Regarding these visits, Jones states in her affidavit, "I do not feel this was appropriate because Mr. Jones is a married man. I am single[;]" "I did not feel that I had the ability to ask Mr. Jones to not come to my home, because he was my boss and there is an inherent power differential[;]" and "I felt I had to permit Mr. Jones to visit me or I would lose my job." Doc. 24-1, ¶¶5-7; *see also* Doc. 23, pp. 93:12-94:5 (Dawson's deposition testimony wherein she stated that the unwelcome sexually-based conduct that she experienced was that she was a single woman and Jones was a married man and her superior and came to her house uninvited). Also, in her interrogatory responses, while not being able to state on which date the following conversations occurred, Dawson alleges that, while Jones was at her home, Jones asked her if there was a man in her life who would care whether he was at her house and Dawson

told him no; Jones told her "about the women he was in love with (not his wife)," that at one point he had separated from his wife for another woman but eventually went back to his wife, and he told her "how he gets women who tell him no, they do not want to sleep with him because he's married, to change their mind" by looking them in the eye, speaking slowly while holding their hand longer than necessary, and touching them frequently. Doc. 30-2, pp. 6-7. Dawson asserts that in response to those statements, she told Jones she "didn't care how long he held [her] hand, [her] no would be no." *Id.* at 7.

Notwithstanding these allegations, Dawson has not demonstrated that she indicated by her conduct that the alleged sexual advances were unwelcome. Rather, Dawson's interrogatory responses reflect that, each time Jones came to her house, Dawson invited Jones inside her home and offered him a drink. Doc. 30-2, pp. 5-7. Further, on two of the three occasions, Dawson knew ahead of time that Jones was coming. *Id.* She borrowed cornhole boards from him for a family party. *Id.* Jones dropped the boards off and later picked them up. *Id.* By asking him in for a drink, she did not show that his appearance at her home was unwelcome and Dawson has not provided any evidence to show that Jones's appearing at her house on these three occasions was "unwelcome."

To the extent that she points to her allegation that she told Jones she "didn't care how long he held [her] hand, [her] no would be no[,]" to argue that she was subjected to unwelcome sexual advances, that statement does not demonstrate that Jones in fact made a sexual advance towards her. Furthermore, Dawson's own deposition testimony refutes her allegation that Jones made sexual advances towards her. She testified:

> Q. Has Mr. Jones ever made any sexual advances towards you?
> A. Can you please explain that?
> Q. Sure. Has he asked you out on a date?
> A. No. Well – no.

> Q. Okay. Did he make any statements to you suggesting that there should be anything other than a professional relationship between the two of you?
> A. No.

Doc. 23, pp. 92:9-17. Additionally, she testified that she did not tell anyone at NEOCAP that she was uncomfortable with some of the conversations that she had with Jones. Doc. 104:12-15.

Dawson also contends that Jones required her to attend non-work related social outings, suggesting that said conduct was part of the unwelcome sexually-based conduct or creation of a hostile or offensive work environment. Doc. 1, p. 3, ¶¶ 10-11. When asked about these outings during her deposition, Dawson explained that the non-work related events involved selling t-shirts for Howland Terrace or Howland Home Reunion, a cause Jones was involved in, and attending the reunion. Doc. 23, pp. 115:19-116:10; 124:11-125:5. While Dawson testified that Jones requested that she assist him with folding the t-shirts, she admitted that there was nothing of a sexual nature that occurred or that was related to the folding of the t-shirts. Doc. 23, pp. 118:9-119:24. Further, Dawson testified that, while she was at the bar after hours helping sell t-shirts, there was nothing of a sexual nature occurred. Doc. 23, p. 123:3-16. And Dawson acknowledged that she never communicated to anyone at NEOCAP that she did not want to assist or attend the non-work related events or was uncomfortable doing so. Doc. 23, pp. 119:10-20; 120:24-121:1; 122:23-123:2; 125:6-15.

Dawson also contends that she was being groomed for an inappropriate relationship between her and Jones. Doc. 1, ¶¶11, 12. However, she does not point to any evidence to show that she was being groomed for an inappropriate relationship. To the extent that Dawson relies on the visits by Jones to her home in July 2016, Dawson has not shown how these visits were an attempt to groom her for an inappropriate relationship. As noted, two of the three visits were related to Dawson's own request to borrow cornhole boards. In fact, Dawson testified that she

was not uncomfortable with Jones coming to her home to drop off the cornhole boards.  Doc. 23, p. 107:15-17.  Additionally, Dawson's own deposition testimony refutes her grooming claim. She testified:

> Q.  When you were going through this list of things that you had problems with with Mr. Jones during the meeting and you were telling Kim [Massary] these things, did you bring up anything about feeling uncomfortable in terms of sexual advances on behalf of Mr. Jones?
> A.  No.
> Q.  Did you tell [Kim] that you thought [Jones] was grooming you for some type of sexual interaction down the road?
> A.  No.
> Q.  Did you even believe that at the time?
> A.  At the time, no.

Doc. 23, pp. 154:25-155:11.

Here, Dawson's own interrogatories and deposition testimony reflect she did not feel the conduct to be sexual or unwelcome at the time and it is not sufficient for her to now "simply state after the fact that [Jones's] advances were unwelcome."  *Jacques*, 447 F. Supp. 2d at 867-68.

Considering the foregoing, the Court concludes that Dawson has failed to present sufficient evidence from which a jury could reasonably conclude that she was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors. Thus, she is unable to establish a claim for quid pro quo sexual harassment or a hostile work environment.  Moreover, the hostile work environment claim also fails because Dawson has not pointed to severe and pervasive hostile behavior to satisfy the fourth element of a hostile work environment claim.

Dawson appears to argue that the UCRC decision is sufficient evidence to prove that there is a genuine dispute of material fact to demonstrate that she was terminated because she failed to submit to Jones's alleged unwelcome sexual advances.  Doc. 30, pp. 2-3, 7-8.  However,

Dawson's reliance on the UCRC decision to defeat summary judgment fails. Dawson acknowledges that R.C. 4141.281(d)(8) limits the preclusive effect of the UCRC decision. Doc. 30, p. 8. Further, while the UCRC determined that Dawson's termination was without just cause because Dawson's alleged insubordination was not sufficient to warrant her immediate discharge under the progressive discipline policy, Doc. 24-2, p. 2, the decision does not address whether Dawson was fired because she failed to submit to Jones's sexual advances. Additionally, as discussed above, Dawson has not presented sufficient evidence from which a jury could reasonably conclude that she was subjected to unwelcome sexual harassment. Thus, viewing the UCRC decision in a light most favorable to Dawson, it does not raise a genuine issue of fact material as to her sexual harassment claim.

For the reasons set forth herein, summary judgment in favor of Defendants on Dawson's sexual harassment claim is warranted because she is unable to present evidence from which a jury could find in her favor on each element of either quid pro quo or hostile work environment sexual harassment.

### 3. State Law Claims – Spoliation of Evidence and Negligent Infliction of Emotional Distress

Defendants also seek summary judgment in their favor on the remaining two state law claims—spoliation of evidence and NIED. Since the Court hereby dismisses all federal jurisdiction claims, the Court declines to exercise supplemental jurisdiction over the remaining state law claims and **DISMISSES** those state law claims—spoliation of evidence (Third Claim for Relief) and NIED (Fifth Claim for Relief)—**WITHOUT PREJUDICE**.

**C. Dawson's Motion**

In her Motion for Summary Judgment, Dawson contends that she is entitled to summary judgment against NEOCAP on the 42 U.S.C. § 1983 and Title VII claims because NEOCAP failed to adopt a policy that governs senior-subordinate non-work-related social interaction and fraternization. She states that her claim is that "the lack of an appropriate fraternization policy led to the violation of Ms. Dawson's constitutional right to equal protection to be free from sexual harassment." Doc. 24, p. 5. For the reasons discussed herein, the Court finds Dawson's claim to be without merit.

As indicated above, Dawson failed to plead in her Complaint the claim she now advances in her motion for summary judgment. While Dawson's Motion characterizes this contention as a claim, as indicated above, it is not pled or even mentioned in her Complaint. Instead, it appears to be a theory that Dawson advances to support liability by NEOCAP for gender discrimination and/or sexual harassment as pled in her First and Fourth Claims for Relief. However, as discussed above, Dawson has failed to demonstrate a genuine dispute of material fact sufficient to overcome summary judgment as to those claims for relief.

Moreover, even if properly pled in her Complaint, she has failed to establish a claim for relief based on the failure of NEOCAP to have a policy that "governs whether [a] married supervis[or] may without invitation visit the homes of single female subordinates[]" (Doc. 24, p. 5). While Dawson cites to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1987) and *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), for the general propositions that "local governing bodies and local officials may be sued under § 1983 in their official capacities for monetary, declaratory, and injunctive relief for actions alleged to be unconstitutional that implements a

policy or custom" and that, "local officials may, in certain circumstances, be held liable under § 1983 for constitutional violations [that] result from failure to train employees[,]" Doc. 24, p. 3, she fails to demonstrate how *Monell* and *City of Canton* establish or demonstrate municipal liability based on the facts she presents.

While Dawson alludes to a failure to train theory of liability (Doc. 24, p. 4), she proceeds to state, "it is not the lack of training that is the gravamen of Ms. Dawson's claim" (Doc. 24, p. 5). Furthermore, Dawson fails to identify legal authority to support her claim that a municipality is required to have the type of policy she describes or that a failure to do so results in a federal constitutional or statutory violation. In addition, while Dawson avers in her Affidavit that, "If NEOCAP had a senior-subordinate or no-fraternization policy, [she] would have known to report Mr. Jones to Human Resources [and] [t]he lack of a policy left [her] without any recourse," (Doc. 24-1, p. 2, ¶¶ 13-14), NEOCAP did have a harassment policy in place and Dawson was aware of that policy (Doc. 23, p. 94:9-19). The policy prohibited harassment; stated that it was NEOCAP's policy "to provide all staff member with a workplace free of harassment as required by Title VII[;]" and established a harassment complaint procedure. Doc. 24-3, pp. 25-26. The harassment complaint procedure provided that "[s]taff members who believe they have been subjected to harassment will notify *any member of management* immediately." Doc. 24-3, pp. 26 (emphasis supplied).

Dawson was aware of the policy but did not report any sexually-based misconduct, stating that she did not do so because she did not know at the time that the conduct, i.e., Jones coming over to her house unannounced, was sexual harassment. Doc. 23, p. 94:20-25. She stated that she learned from a friend after she was terminated that such conduct was sexual harassment. Doc. 23, p. 94:23-95:6. She also stated during her deposition that, while the policy

said she could bring her complaints to any director and, while Jones never threatened her employment in any way, Jones instructed her that she could not talk to other individuals because he was concerned about confidentiality.  Doc. 23, pp. 104:12-106:4.

No matter Dawson's after-the-fact reasons for not reporting the conduct which she now claims amounted to sexual harassment, had Dawson felt harassed by Jones, NEOCAP's policy provided her an avenue for reporting that behavior.  Furthermore, as discussed herein, Dawson has not demonstrated that the failure to have a policy in place that specifically governed senior-subordinate non-work-related social interaction and fraternization establishes liability on the part of NEOCAP under Title VII or § 1983.

Based on the foregoing, the Plaintiff's motion for partial summary judgment is **DENIED**.

## IV.     Conclusion

For the reasons set forth herein, the Court **GRANTS in part** Defendants' Motion for Summary Judgment seeking dismissal of all of Plaintiff's claims with prejudice.  As discussed herein Defendants are entitled to summary judgment as to Plaintiff's federal claims stated in her First, Second, and Fourth Claims for Relief and those claims are **DISMISSED WITH PREJUDICE**.  The Court declines to exercise supplemental jurisdiction over Dawson's state law claims for spoliation of evidence and negligent infliction of distress and those claims, the Third and Fifth Claims for Relief, are **DISMISSED WITHOUT PREJUDICE**. [11]   Plaintiff's Motion for Summary Judgment (Doc. 24) is **DENIED**.


Dated:  August 20, 2019                    */s/ Kathleen B. Burke*
                                    Kathleen B. Burke
                                    United States Magistrate Judge

---

[11] In her opposition brief, Dawson asserts that her five-count complaint asserts both state and federal sexual and gender discrimination claims.  Doc. 30, p. 1.  However, Dawson did not plead state law gender discrimination or sexual harassment claims. Even if she had, for the reasons discussed herein, summary judgment in favor of Defendants would be warranted on those claims.  *See e.g., Knox v. Neaton Auto Prod. Mfg., Inc.*, 375 F.3d 451, 457 (6th Cir. 2004) ("The prima facie case requirements [of federal gender discrimination claims] are essentially the same under the Ohio Revised Code § 4112.01.").